THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> [22] VICTOR LOPERENA-MENDEZ, <br><br> Defendant. | Crim. No. 18-597 (ADC) |

**OPINION AND ORDER**

Pending before the Court is defendant Víctor Loperena-Méndez's (hereinafter "defendant") motion to suppress. **ECF No. 559**. The government opposed. **ECF No. 658**. The Court held an evidentiary hearing on the matter. **ECF Nos. 929, 930, 793.** For the following reasons, defendant's motion is **DENIED**.

I.   **Procedural Background**

Defendant is charged with conspiring to possess with intent to distribute controlled substances (Count One) and aiding and abetting in the possession with intent to distribute marihuana (Count Four). **ECF No. 3**. The charges arise from an investigation conducted by Homeland Security Investigations (HSI), the United States Postal Service Office of the Inspector General (USPS-OIG), and the United States Postal Inspections Service (USPIS) into a drug trafficking organization (hereinafter "DTO") allegedly using the US Postal Service to transport narcotics between Puerto Rico and the United States mainland. As part of the investigation, the

agency intercepted wired communications under the provisions of 18 U.S.C. § 2516 ("Title III") which ultimately led to defendant's arrest and indictment. At the time of defendant's arrest the government also seized defendant's cellular phone which was subjected to forensic analysis.

Defendant moved to suppress thirty-eight photographs extracted from his cellular phone, arguing that agents lacked probable cause to arrest him and that the phone was seized during his unlawful arrest. **ECF No. 559**. He further argued that the photographs and data were extracted from his cellular phone without a search warrant. *Id.* The government opposed, arguing that federal agents had probable cause to arrest defendant, a US postal employee at the time, pursuant to the Title III investigation and defendant's alleged involvement in the conspiracy to transport narcotics through the US mail. **ECF No. 658**. Additionally, the government asserted that contrary to defendant's assertions, federal agents obtained a valid-search warrant for defendant's-cellular phone. *Id.*

The Court conducted an evidentiary hearing on September 25, 26, 2019 and February 26, 2020. During the evidentiary hearing, the Court heard testimony from US Postal Inspector Jean Michael Bodner ("Inspector Bodner"), USPS-OIG Special Agent Armando Cardona ("SA Cardona")and defendant. Furthermore, the recordings and transcripts of the Title III recordings were submitted into evidence. *See* **Gov't. Ex. 1(a), 3, 5(a), Ex. 10(a), 13(a), 15(a), 15(b)**.

## II. Findings of Fact

On February 10, 2019, defendant, along with three co-defendants, was arrested by federal agents, following an investigation by HSI, the USPS-OIG and the USPIS into the use of the postal

service by a DTO for the transport of narcotics. Inspector Bodner and SA Cardona testified about the facts surrounding the investigation into the DTO, defendant's alleged involvement in aiding the conspiracy, his arrest and the search of defendant's cellular phone.

Around 2005, an investigation called Green Mountain was opened in relation to a DTO utilizing the US mail to transport drugs, such as marihuana and heroin, between various states and Puerto Rico. The organization also smuggled narcotics to Puerto Rico through Mexico. Inspector Bodner explained that Green Mountain was run by the Organized Crime Drug Enforcement Task Force (OCDETF), an organization that aids in the investigation of complex cases, allowing the participation of multiple-federal agencies. Accordingly, the case was jointly investigated by the USPIS, HSI, Puerto Rico Police, USPS-OIG and FBI. Throughout the course of the investigation, federal agents intercepted various-wire communications pursuant to Title III warrants, seized approximately 60 parcels and arrested several members of the DTO.

Inspector Bodner testified about the telephone conversations he listened to as part of the investigation.[1] Via said phone calls, federal agents identified a scheme employed by Ignacio Rivera-Hernández (alias "Nacho"),[2] Raul Piñero-Robles (alias "Pulga"),[3] Giovanni González-

---

[1] The recordings for the August 26, 29, and November 7, 2016 telephone calls mentioned by Inspector Bodner were played in open court and the corresponding transcripts were admitted into evidence. *See* **Gov't. Ex. 1(a), 3, 5(a).** When reviewing the Title III recordings, Inspector Bodner received assistance from a cooperator, who was asked to identify the members of the organization participating in those phone calls.

[2] Rivera-Hernández was the leader of the DTO and main connection between different suppliers, enforcers and runners, who recruited postal employees and police officers in furtherance of the organization's scheme.

[3] Piñero-Robles was a leader in the organization, a cocaine and heroin supplier and had contacts for shipments into Puerto Rico.

La Santa and other members of the DTO, for the transport of narcotics and money orders using the US mail.

Inspector Bodner testified that during the investigation, he learned that a postal employee might be aiding the DTO in the transportation of parcels with narcotics. Specifically, there were four-telephone conversations heard by Inspector Bodner in which a postal employee was referenced.[4] According to Inspector Bodner, albeit his name was not mentioned, he was first able to identify that the DTO members were referring to defendant through a specific phone call that took place in November 4, 2016. *See* **Gov't Ex. 10(a)**.

During the November 4, 2016 phone call, a member of the DTO mentioned that "his" guy from Fajardo had received a phone call from an inspector requesting his assistance in intercepting some parcels set to arrive at the Puerto Real post office (also commonly referred to as the "small" or "playa" Fajardo post office)(hereinafter "Puerto Real"). At the time, defendant worked as a distribution window clerk at Puerto Real.[5] The DTO member knew specific details of the conversation between the inspector and the postal employee regarding the number of parcels set to arrive and their approximate weight.

---

[4] The recordings for the November 4, December 14, 2016 and two December 20, 2016 telephone calls were played in open court during SA Cardona's testimony and the corresponding transcripts were admitted as evidence. *See* **Gov't. Ex. 10(a), 13(a), 15(a), 15(b)**.

[5] As will be discussed below, defendant was the only full-time employee working at Puerto Real aside from the postmaster. Admittedly, the postmaster was not present at Puerto Real every day, and, as window clerk, defendant oversaw providing services to clients. A part time employee worked on Thursdays, defendant's day off.

To provide context regarding the importance of such call, Inspector Bodner explained that his agency employs various methods to intercept parcels. One of those methods involves contacting the post office to inform them that they are waiting for a suspicious parcel's arrival and requesting that upon its arrival, the post office personnel hold the parcel until agents can go to the post office to retrieve it. He further explained that during the investigation, he tasked Puerto Rico Task Force Officer (TFO) Juan Báez, who works with the USPS, with intercepting two parcels coming in from California addressed to a post office box at Puerto Real. TFO Báez then contacted defendant at Puerto Real and requested his assistance in intercepting and holding the two parcels on the government's behalf. Through the November 4, 2016 phone call recording, Inspector Bodner learned that soon after TFO Báez contacted the Puerto Real postal employee, (*i.e.*, defendant, providing specific information about the parcels to be intercepted), defendant informed the DTO members that the government was going to intercept the parcels arriving at Puerto Real. Upon learning of defendant's involvement in the case, Inspector Bodner contacted the USPS-OIG, the agency in charge of investigating misconduct by postal workers and provided the USPS-OIG with four-phone-call recordings and transcripts where DTO members mentioned a postal employee's involvement in the conspiracy. SA Cardona then became involved in the Green Mountain investigation.

During his testimony, SA Cardona explained that there are two post offices in Fajardo: Fajardo Main and Puerto Real, also known as the "playa" post office.[6] While the Fajardo main

---

[6] The post office is located near the then existing Vieques and Culebra ferry terminal.

post office carriers go out and deliver mail, the Puerto Real postal employees deal with transactions and day to day operations such as renting post office boxes, selling stamps and money orders, and accepting mail from local residents or local customers that visit the area. Additionally, the Fajardo Main post office has over 20 employees and is headed by a female postmaster, while at Puerto Real there is only one full-time-window clerk (defendant) and a part-time employee, both supervised by a male postmaster.

Upon an analysis of the telephone conversations, and defendant's daily duties and schedule, SA Cardona confirmed that defendant was the postal employee mentioned by the DTO members in the various phone calls. Specifically, from the conversations among the members of the DTO, federal agents learned that they had a "guy" who worked at Puerto Real and referred to him as "El Carte" (short for "cartero" or postman in Spanish). The DTO members knew that the postal employee's supervisor or postmaster was male, that the postmaster was not at Puerto Real every day, and that defendant was the only employee working at Puerto Real aside from the postmaster and a part time employee. They were also aware that defendant worked every day except Thursdays, he had daily breaks between 12:00-2:00 pm, and went to work at Puerto Real in the mornings, where he would "catch" parcels and deliver express mail collected at Puerto Real to Fajardo main office using his personal vehicle. The callers further mentioned that the postal employee instructed the organization's members when to open post-office boxes at Puerto Real and how often to use the boxes. He also "rescued" parcels from Fajardo main when he went to pick up mail and transported the parcel to Puerto Real for sorting

and pickup. Most importantly, SA Cardona pointed out that the only person that TFO Báez contacted regarding the parcels to be intercepted at Puerto Real was defendant. Consequently, only defendant knew the details regarding the parcels to be intercepted and the post-office boxes they were looking into as part of the investigation.

As the investigation continued, on February 6, 2017, agents identified another parcel that was shipped from California addressed to a postal office box at Puerto Real and began tracking the suspicious parcel. Based on its similarities with previously intercepted parcels and the information obtained regarding defendant's potential involvement, on Thursday, February 9, 2017, federal agents began surveillance of defendant. Agents learned that early in the morning, the parcel was scanned, marked as processed at Fajardo main and appeared as available for pick up at Puerto Real; nevertheless, the parcel remained at Fajardo main office. Despite being his day off work, at around 11:55 am, agents observed defendant arrive at Puerto Real in his personal vehicle. Defendant left Puerto Real at 12:20 pm and drove by Fajardo main but did not stop. The parcel remained at Fajardo main office and was not claimed.

On February 10, 2017, surveillance of defendant and the suspicious parcel continued, with agents at Fajardo main and in the area surrounding Puerto Real[7], both on foot and in unmarked vehicles. On said date, the postmaster instructed defendant to pick up mail left from the day before at Fajardo main and transport it to Puerto Real. Defendant, however, asked the postmaster to assign another postal employee to transport the parcel and mail to Puerto Real

---

[7] SA Cardona observed the area from an unmarked vehicle located across Puerto Real.

because he had to get petty cash at the financial institution across the street from Fajardo main. Federal agents observed defendant, who was wearing a postal worker uniform, go to the financial institution near Fajardo main. They also followed the postal employee who took the parcel in a postal vehicle from Fajardo Main to Puerto Real.

Defendant arrived at Puerto Real mid-morning in his personal vehicle, remained inside the post office for around 45 minutes to an hour, then left the post office. Upon defendant's departure, an agent went into Puerto Real, confirmed that the parcel was still there, and that defendant did not take it with him. The postmaster informed the agent that defendant left work citing that he did not feel well and had a medical appointment.

In the meantime, while canvassing the area, agents located defendant's car, unoccupied and parked approximately a block away from Puerto Real, in El Barrio Maternillo, near a business called Rosa's Bar. Agents also observed a white four door Yaris in Calle Union (a one-way street adjacent to Puerto Real), with two occupants. They advised SA Cardona that the passenger signaled the driver to turn around, that the Yaris parked a block away from the Puerto Real post office, the passengers got out of the vehicle, and the passenger gestured the driver to go into the bar. The Yaris' passenger then walked in the direction of the on-foot agents, appearing to follow them, while talking on a cell phone.

The agents walked towards the pier area nearby, where a pier security guard remarked that he was following the agents and asked the agents if they knew "that person", referring to the Yaris' passenger. After agents respond in the negative and asked the security guard whether

he knew the Yaris' passenger, the security guard told agents that he was a postal employee at Puerto Real. At that time, agents identified the Yaris' passenger as defendant and alerted surveillance units that defendant had changed to civilian clothes, was following them on foot, while talking on the phone, and was not in a medical appointment.

In the interim, SA Cardona observed a Toyota Murano slowly drive by the street adjacent to Puerto Real; the driver appeared to be looking into the cars parked on the street. The Murano drove by the street again and parked in front of the Puerto Real post office. SA Cardona observed a male go into the post office and alerted agents that someone appeared to be picking up the parcel. The postmaster called SA Cardona and confirmed that the parcel was picked up by the male.

SA Cardona saw the male exit the post office carrying the parcel. The male got into the Murano's passenger side.[8] Agents then maneuvered their vehicle next to the Murano, identified themselves as federal agents and instructed the driver and passenger to turn off and exit the vehicle. The suspects sped away, attempting to flee, injuring an agent in the process. The Murano, however, crashed into one of the surveillance units that was blocking the street. The suspects were once again instructed to exit the vehicle, arrested, and the parcel was seized from inside the Murano.[9]

---

[8] Although SA Cardona did not explicitly state that the male got into the Murano, it can be inferred from his later testimony that both the male and the driver of the Murano were instructed to turn off and exit the vehicle.
[9] The parcel contained approximately 13 pounds of marihuana.

As Inspector Bodner drove toward the crash scene, he contacted SA Cardona and informed that defendant was standing next to the white Yaris with another male, talking on the phone; SA Cardona instructed agents to stop defendant. Defendant and another individual were detained for questioning, handcuffed on February 10, 2017 and taken on foot to a nearby US Customs House. Defendant's-cellular phone was seized from his person during the arrest. Defendant was later released. On March 2, 2017, federal agents applied for a federal search warrant of defendant's cellular phone. On March 10, 2017, the search warrant was executed, and thirty-eight photographs were extracted from defendant's cellular phone.

### III. Analysis

Defendant seeks suppression of 38 photographs extracted from his cell phone, which was seized incident to his arrest, alleging that agents lacked probable cause to arrest him. He further argues that his cell phone was searched without a warrant. After reviewing the evidence and applicable law, this Court disagrees.

The Fourth Amendment "protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"[10] *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) (alteration in original) (quoting U.S. Const. amend. IV). "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances. *District of Columbia v. Wesby*, 138 S. Ct. 577, 585-586 (2018) (citing *Payton v. New York*, 445 U. S.

---

[10] The government does not dispute defendant's standing to bring their suppression motion. **ECF No. 64**. *See United States v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (explaining standing under the Fourth Amendment).

573, 585 (1980)). A warrantless arrest is permissible under the Fourth Amendment where there is probable cause, *i.e.*, where reasonably trustworthy facts and circumstances would enable a reasonably prudent person to believe that the arrestee has committed or is committing a crime. *Id.*; *see also Robinson v. Cook*, 706 F.3d 25, 33 (1st Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152-54 (2004)). In this context, "probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *United States v. Figueroa*, 818 F.2d 1020, 1023-1024 (1st Cir. 1987) (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

Court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Wesby*, 138 S. Ct. at 586 (citing *Maryland v. Pringle*, 540 U. S. 366, 371 (2003)). Accordingly, the reasonableness "must be evaluated in light of the totality of circumstances." *United States v. Torres-Maldonado*, 14 F.3d 95, 105 (1st Cir. 1994) (quoting *United States v. Uricoechea-Casallas*, 946 F.2d 162, 165 (1st Cir. 1991)). The Supreme Court emphasized that "[p]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232. It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. To establish probable cause, the government "need not present the quantum of proof necessary to convict." *Torres-Maldonado*, 14 F.3d at 105 (quoting *Uricoechea-Casallas*, 946 F.2d at 165). Therefore, probable cause "is not a high bar." *Wesby*, 138 S. Ct. at 586 (citing *Kaley v. United States*, 571 U.S. 320, 134 (2014).

Federal agents in this case undoubtedly arrested defendant based on probable cause that a crime had been committed—that is, conspiring to possess with intent to distribute and aiding and abetting in the possession with intent to distribute narcotics. During the evidentiary hearing, the government presented ample evidence as to the extensive investigation conducted by various federal agencies, which included Title III recordings showing the DTO's scheme and defendant's involvement in aiding the organization's use of the US mail to transport narcotics. Agents heard DTO members discussing packages containing narcotics sent via the US mail and when some of those packages were seized by authorities. They further identified that a postal employee, later known to be defendant, aided the DTO members in opening post-office boxes at Puerto Real, advised them when to pick up parcels and alerted them when agents were going to intercept suspicious parcels. Agents cross-referenced the information obtained from the Title III recordings with defendant's schedule, his duties as distribution window clerk at Puerto Real, and the fact that he was the only full-time clerk at Puerto Real. Most importantly, TFO Baez's communications with defendant regarding the suspicious parcels to be intercepted were evidently relayed by defendant to the DTO members. This was uncontested proof of defendant's involvement for purposes of a probable cause analysis.

Additionally, defendant's actions on February 9 and 10, 2017, led agents to reasonably believe that he was actively involved in the scheme to retrieve and transport the suspicious parcel under surveillance on said dates. The facts show that defendant went to Puerto Real on Thursday, February 9, 2017, on his day off, when the package under surveillance was marked

as available for pick up at that post office. Presumably, upon then learning that the package was at Fajardo main, defendant left Puerto Real and drove by Fajardo main. Although he did not stop or enter Fajardo main, his behavior was understandably suspicious.

The next day, defendant left work because of an alleged medical appointment, but he never attended such appointment. Instead, agents observed defendant, who had changed his uniform for civilian clothes, walking in the area near Puerto Real, talking on his phone while looking at and apparently trailing on-foot the agents that were conducting the surveillance. Simultaneously, agents observed two individuals in a Murano circling the area, checking the interior of parked cars and eventually, watched when the male passenger of the Murano entered Puerto Real and retrieved the suspicious parcel. This sequence of events, taken together with the investigation's findings, unquestionably afforded agents a reasonable belief that a crime was being committed and defendant was part of such scheme.

Defendant's convoluted version of the events to explain his behavior prior to his arrest simply lacked credibility. He proffered that he changed his clothes and a friend picked him up to take him to the doctor's appointment because parking space was scarce in the area near the doctor's office. Nevertheless, according to defendant's testimony, his friend parked far away from the doctor's office because there was no parking, defeating defendant's proffered reason for having his friend pick him up instead of driving to the doctor's office in his own vehicle. Moreover, his vehicle was found by agents parked nearby and defendant was observed walking near the Puerto Real area.

Defendant further testified that he left the doctor's office because it was full of people and was intercepted by the agents when his friend was going to take him back to his car. Yet, in his motion to suppress, defendant contends that he remained near the doctor's office with a friend, apparently waiting for his turn, but "missed" the doctor's appointment. Consequently, the Court finds that defendant's contradictory and self-serving testimony regarding the events that transpired on February 9 and 10, 2017, did not rebut the plethora of facts and circumstances known by agents which led them to reasonably believe he was involved in the conspiracy and there was probable cause for his arrest.

Additionally, there is no question that defendant's cell phone was lawfully seized during his arrest. The search incident to arrest doctrine is clearly established in *Chimel v. California*, 395 U.S. 752, 762-763 (1969), where the Supreme Court held it is entirely reasonable for an arresting officer to search the arrestee's person and the area within his immediate control, that is, the area from within which he might gain possession of a weapon or destructible evidence. Since agents had probable cause to arrest defendant, the seizure of his phone incident to the arrest was also reasonable. Especially considering that agents observed defendant talking on his cell phone while he followed on-foot agents surveilling the area likely serving as a lookout for the organization.

Lastly, as the record shows, federal agents obtained a valid-search warrant for defendant's-cellular phone. *See* **Gov't Ex. 17**. Defendant did not impugn the validity of the search warrant or its execution. As such, any argument is deemed waived at this juncture.

Consequently, defendant's attempt to suppress the photographs seized from his phone on these grounds also fails.

### IV.  Conclusion

Based on the above, the motion to suppress is **DENIED. ECF No. 559**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 8th day of May, 2023.

                                                    **S/AIDA M. DELGADO-COLÓN**
                                                    **United States District Judge**